**Priscilla B. GREEN, Appellant,**

v.

**WATERFORD BOARD OF EDUCA-TION et al., Appellees.**

No. 213, Docket 72–1676.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1972.

Decided Jan. 29, 1973.

Martin A. Gould, Hartford, Conn. (Gould, Killian & Krechevsky, Hartford, Conn., on the brief), for appellant.

Melvin Scott, New London, Conn. (C. George Kanabis, Narcyz Dubicki, Traystman, Scott & Kanabis, New London, Conn., on the brief), for appellees.

Before LUMBARD, FEINBERG and MANSFIELD, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Priscilla B. Green, a school teacher, was forced by defendant Board of Education of the Town of Waterford, Connecticut, to take a leave of absence without pay from her job because of pregnancy, although she wanted to teach another two and one-half months and

claimed to be able to do so. Arguing that the Board's inflexible maternity leave provision denied her the equal protection of the laws, plaintiff brought a civil rights action, 42 U.S.C. § 1983, in the United States District Court for the District of Connecticut. Chief Judge M. Joseph Blumenfeld dismissed plaintiff's complaint, 349 F.Supp. 687, and she appeals. We conclude that plaintiff stated a valid constitutional claim, and we reverse and remand for further appropriate proceedings.

## I

The facts of the case are simple and in large part undisputed. In early September 1971, plaintiff was a nontenured teacher of English at Waterford High School under a one-year employment contract with the Waterford Board of Education. At that time, she informed the principal of Waterford High School that she was pregnant, that her due date was about mid-February 1972, and that she wanted to continue teaching until January 31, 1972, which she characterized as the end of the first semester. Shortly thereafter, the Waterford Superintendent of Schools, defendant Charles J. Cupello, told plaintiff that her leave would start as soon as a suitable replacement could be found. Plaintiff tried to persuade the Board to let her continue to teach until the end of January, but this effort was fruitless. In a letter dated October 15, 1972 the Superintendent notified plaintiff that the Board had voted to grant her request for a maternity leave of absence "effective at such time as a suitable, certified replacement may be secured," in accordance with Article XIV of an agreement between the Board and defendant Waterford Education Association, the collective bargaining agent for Waterford teachers. The provisions of Article XIV, referred to in the letter, are set forth in the margin.[1] The key portion requires a maternity leave without pay to begin "not less than four months prior to expected confinement or at such earlier time as a replacement becomes available." Thereafter, the Superintendent notified plaintiff that a replacement had been secured, who would assume plaintiff's classroom duties on November 17, 1971, "at which time your maternity leave will commence." Soon after, plaintiff brought this suit in the district court.

The basis of plaintiff's action is that a mandatory maternity leave provision for teachers which fails to consider the physical ability of the individual and which treats pregnancy differently from any other form of disability deprives a pregnant teacher of rights guaranteed under the fourteenth amendment. The complaint sought an order requiring defendants to permit her to teach "until such time as her gynecologist shall deem that she is physically unable to continue to teach, or until January 31, 1972, whichever shall sooner occur"; plaintiff alternatively sought damages for lost salary if forced to leave her job. Chief Judge Blumenfeld denied an application

1. *ARTICLE XIV—MATERNITY LEAVE*
    As soon as any teacher shall become aware of her pregnancy, she shall forthwith apply in writing to the Superintendent of Schools for a maternity leave of absence, and shall accept a leave of absence as provided by the Board of Education.
    A maternity leave shall begin not less than four months prior to expected confinement or at such earlier time as a replacement becomes available. The leave shall extend only for the current year. This leave shall also be extended for the following school year for tenure teachers upon written request.

Teachers on maternity leave shall be placed on a waiting list for future appointment and shall have priority for a vacancy. Maternity leave shall not result in loss of accumulated sick leave or loss of tenure. This paragraph does not apply to non-tenure teachers.
    Any woman who is aware of her pregnancy prior to August 1, shall only return to school in September at the discretion of the Superintendent.
For convenience, we sometimes refer to Article XIV as the "Board's rule," though we realize that defendant Waterford Education Association is a party to the agreement in which it is set forth.

for preliminary injunctive relief on the ground that since money damages would be fully compensatory, there was no showing of possible irreparable injury. Plaintiff properly does not complain of this ruling. Her claim was then limited to damages for loss of salary from November 17, 1971, when her forced maternity leave began, to January 31, 1972. Defendants Board of Education and Cupello moved to dismiss for want of federal jurisdiction because plaintiff "failed to state . . . infringement of a Federally protected right." The judge treated the motion as one for summary judgment under Fed.R.Civ.P. 56 [2] and ruled for defendants on the ground that "the maternity leave provision at issue is not so lacking in rational basis as to constitute a denial of equal protection."

## II

This quotation from the district judge's opinion brings us to the threshold question of what standard of review to apply in testing the constitutionality of the Board's maternity leave rule. In recent years, the Supreme Court has developed what has been characterized as "a rigid two-tier attitude" [3] in equal protection cases. In most instances, statutory or regulatory classifications are presumptively constitutional and will not be disturbed unless they are without rational basis, resting "on grounds wholly irrelevant to the achievement" of some permissible state purpose. McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); see Morey v. Doud, 354 U.S. 457, 463–464, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). In other cases, however, where the classification is grounded on certain "suspect" criteria, e. g., Graham v. Richardson, 403 U.S. 365, 372, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971), or where the classification impinges upon certain "fundamental" rights, e. g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), "strict" judicial scrutiny is required, and the classification will not stand unless justified by some "compelling governmental interest." E. g., Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

Plaintiff strenuously urges that the stringent standard of review is appropriate here. She argues that her case involves both fundamental rights ("the right to work at one's chosen profession . . . [and] the right to bear children") [4] and a classification based on sex, an inherently suspect criterion. The Supreme Court, however, has not yet added sex to the list of suspect classifications [5]—race, nationality, alienage—and while some courts [6] and commentators [7] have concluded otherwise, we accept arguendo the district court's

---

2. Citing Berman v. National Maritime Union, 166 F.Supp. 327, 332 (S.D.N.Y. 1958), and Stella v. Kaiser, 82 F.Supp. 301, 312 (S.D.N.Y.1948), plaintiff claims that the court erred in viewing what was essentially a motion to dismiss under Fed. R.Civ.P. 12(b)(1) and (2) as a motion under 12(b)(6) and then treating it as a motion for summary judgment. In view of our disposition of the case, we need not consider this issue.

3. Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1, 8 (1972).

4. Brief for Appellant at 16.

5. E. g., Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948). The question may be expressly decided in Frontiero v. Laird, 341 F.Supp. 201 (M.D. Ala.1972) (3-judge court), prob. juris. noted, 409 U.S. 840, 93 S.Ct. 64, 34 L.Ed. 2d 78 (1972), argued before the Supreme Court on January 17, 1973, and now sub judice.

6. E. g., United States ex rel. Robinson v. York, 281 F.Supp. 8, 14 (D.Conn.1968); Sail'er Inn, Inc. v. Kirby, 5 Cal.3d 1, 95 Cal.Rptr. 329, 339–341, 485 P.2d 529, 539–541 (1971). Cf. Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 606 (S.D.N.Y.1970).

7. E. g., Note, Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment?, 84 Harv.L.Rev. 1499, 1507–1508 (1971); 1972 Wisc.L.Rev. 626, 632–633.

assumption that rational basis scrutiny is the appropriate standard of review in this case. Cf. Gruenwald v. Gardner, 390 F.2d 591 (2nd Cir. 1968).

In several cases from its past Term, however, the Court has suggested that rational basis scrutiny is not so deferential a standard of review as had been previously and generally supposed. First, the Court has apparently narrowed the linguistic gap between the two standards; it has avoided the terminology of two-tiered review in some cases, by posing instead certain fundamental inquiries applicable to "all" equal protection claims.[8] Thus, in Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), invalidating a Louisiana workmen's compensation law that discriminated against dependent unacknowledged, illegitimate children, the Court stated, 406 U.S. at 173, 92 S.Ct. at 1405, that the "essential inquiry" in all equal protection cases is

> inevitably a dual one: What legitimate state interests does the classification promote? What fundamental personal rights might the classification endanger?[9]

And in Police Department v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), which held unconstitutional a Chicago ordinance that differentiated between types of peaceful picketing on the basis of subject matter, the Court stated, 408 U.S. at 95, 92 S.Ct. at 2290:

> As in all equal protection cases, however, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment. See Reed v. Reed, 404 U.S. 71, 75–77 [92 S.Ct. 251, 253–254, 30 L.Ed.2d 225] (1971); Weber v. Aetna Casualty Co., 406 U.S. 164 [92 S.Ct. 1400, 31 L.Ed.2d 768] (1972); Dunn v. Blumstein, 405 U.S.

330, 335 [92 S.Ct. 995, 31 L.Ed.2d 274] (1972).[10]

Moreover, the Court seems far less willing to speculate as to what unexpressed legitimate state purposes may be rationally furthered by a challenged statutory classification. Compare McGowan v. Maryland, *supra,* 366 U.S. at 425–426, 81 S.Ct. 1101, with Gunther, *supra* note 3, at 33 (discussing James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972)).

Finally, and perhaps most significantly, the Court's definition of what constitutes the necessary rational relationship between a classification and a legitimate governmental interest seems to have become slightly, but perceptibly, more rigorous. While under McGowan v. Maryland, *supra,* a classification is to be sustained unless it is "wholly irrelevant" to some permissible purpose, cases from the past Term spoke differently. In Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), for example, which struck down a section of the Idaho probate code giving mandatory preference to men over women when competing for the right to administer an estate, Chief Justice Burger stated for a unanimous Court, 404 U.S. at 76, 92 S.Ct. at 254:

> A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having *a fair and substantial relation to the object of the legislation.* . . ." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, [40 S.Ct. 560, 561, 64 L.Ed. 989] (1920). The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced . . . . [Emphasis added.]

---

8. See Gunther, *supra* note 3, at 17.

9. Justice Powell's opinion for the Court was joined by six other Justices. Justice Blackmun concurred in the result and Justice Rehnquist dissented.

10. Justice Marshall's opinion for the Court was joined by five other Justices. Justices Blackmun and Rehnquist concurred in the result, and Chief Justice Burger concurred in a separate opinion.

See also Weber v. Aetna Casualty & Surety Co., *supra*, 406 U.S. at 175, 92 S. Ct. at 1406 ("The inferior classification of dependent unacknowledged illegitimates bears . . . no *significant relationship* to those recognized purposes . . . which workmen's compensation statutes commendably serve." [Emphasis added.]); cf. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

With these very recent indications of the proper inquiry in mind, cf. Aguayo v. Richardson, 473 F.2d 1090 (2nd Cir. 1973)', we turn to plaintiff's argument that the Board's maternity leave policy denied her the equal protection of the laws.

### III

The heart of plaintiff's case is that disqualifying a physically capable woman from working because of a condition related solely to her sex is unconstitutionally discriminatory. Plaintiff admits the obvious, that men do not become pregnant, but points out that men, being human, are also subject to crises of the body, some of which, like childbirth, give ample warning: A cataract operation or a prostatectomy, for example, may be planned months ahead. Because male teachers are not forced by defendant Board to take premature leave because of a known forthcoming medical problem, female teachers should not be treated differently. Thus stated, the argument is persuasive, even compelling. One realizes with a shock what so many women now proclaim: Old accepted rules and customs often discriminate against women in ways that have long been taken for granted or have gone unnoticed.

■ But such a visceral reaction, of course, is not the end of the inquiry, although it serves well as the beginning. An equal protection argument requires careful analysis not only of the effect of the claimed discrimination but also of the degree to which the discriminatory classification furthers legitimate state interests. Defendants in their brief and at oral argument have offered no ·direct justification for the rigid rule of Article XIV, but rely obliquely on "the several cases considering the problem of maternity leave clauses." [11] Indeed, we note that a principal problem on this appeal is an altogether abbreviated record, consisting of little more than plaintiff's verified complaint, defendant's answer, a few short interrogatories, the argument on the motion for a preliminary injunction, and the district judge's opinion. We thus have no assurance that any legitimate interest arguably promoted by the rule has been identified or articulated by the Board. Cf. Gunther, *supra* note 3, at 47. But giving defendants the benefit of the doubt, we will examine the rationality of the maternity leave rule in relation to those state interests principally suggested by Judge Blumenfeld: "concern for the [health and] safety of the teacher and her unborn child," continuity of education, and administrative convenience.

As to the Board's possible concern with health, plaintiff asked to remain on the job only "until such time as her gynecologist shall deem that she is physically unable to continue to teach, or until January 31, 1972, whichever shall sooner occur," [12] so that her health or that of the unborn child would presumably not have been endangered had she continued to teach. At the hearing on a preliminary injunction, plaintiff was apparently prepared to support her claim with "Medical evidence regarding competency of a pregnant woman"; [13] while there is an intimation that defendants intended to offer contrary evidence,[14] this was not done. Why the Board should choose, by means of an inflexible rule, to manifest ‾particular concern with the health of a pregnant

11. Brief for Appellees at 15.

12. Plaintiff's motion for preliminary injunction, at 1.

13. Transcript of hearing of November 17, 1971, at 3.

14. Id. at 12.

woman, but not, for example, with the health of a teacher (male or female) recuperating from a heart attack is nowhere explained. In any event, we see little rationality in a rule that purports for reasons of health alone to treat all pregnancies alike rather than on a case-by-case basis. Cf. Corsover v. Board of Examiners, 59 Misc.2d 251, 298 N.Y.S.2d 757 (Sup.Ct. Kings Co. 1968). We do not suggest that the Board would be bound by the judgment of plaintiff's doctor, but there was no individual assessment here of plaintiff's ability to continue to work.

As to safety, it is depressingly true these days that violence from students is a possibility, not pure fancy. Whether that possibility justifies treating pregnant teachers differently from male teachers is highly questionable. When the comparison is with other female teachers, any justification for focusing solely on those who are pregnant is still more dubious in the abstract and wholly so on this record.[15] See Comment, Mandatory Maternity Leave of Absence Policies—An Equal Protection Analysis, 45 Temple L.Q. 240, 245 (1972). Furthermore, any rational rule motivated by interests in safety should logically take account of variations in the location of schools and in the age of students; the Board's maternity leave provision does not do so. An additional state interest —avoiding "classroom distractions" caused by embarrassed children "pointing, giggling, laughing and making snide remarks" about their teacher's condition—emerges from one of "the several cases" to which defendants refer.[16] We regard any such interest as almost too trivial to mention; it seems particularly ludicrous where, as here,

plaintiff taught only high school students. Whatever may have been the reaction in Queen Victoria's time, pregnancy is no longer a dirty word.

The only substantial justifications for the Board's maternity leave rule relate to continuity of classroom education and to administrative efficiency and convenience. As to these, the district judge said:

> The plaintiff acknowledges that at some point prior to the birth of her child she would have had to take a maternity leave. It is not irrational that, in order to achieve an orderly transition between teachers, the Board of Education required substantial advance notice of her termination date. That the board, with the concurrence of the teachers' association, chose to fix that date at the end of five months of pregnancy was well within the bounds of reason. It was not required to go through a "battle of obstetricians" in each case to determine when a particular teacher would be required to leave before it could locate a replacement teacher and offer her a definite starting date.

Continuity of instruction is surely an important value. Where a pregnant teacher provides the Board with a date certain for commencement of leave, however, that value is preserved; an arbitrary leave date set at the end of the fifth month is no more calculated to facilitate a planned and orderly transition between the teacher and a substitute than is a date fixed closer to confinement. Indeed, the latter—as was the case here—would afford the Board more, not less, time to procure a satisfactory long-term substitute.[17] There re-

---

15. One of defendants' interrogatories to plaintiff asked whether she was "ever threatened or physically abused by any students." Plaintiff replied that she had once been slapped in the face by a female student, without injury.

16. La Fleur v. Cleveland Bd. of Educ., 326 F.Supp. 1208, 1210, 1213 (N.D. Ohio

1971). As we note below, this decision was reversed by the Court of Appeals for the Sixth Circuit, 465 F.2d 1184.

17. We also note that in any school operating under a semester system, plaintiff's departure on January 31 would be less disruptive of classroom continuity than a leave required, as here, to com-

mains, of course, the possibility of premature childbirth or complications in the late stages of pregnancy, eventualities which might upset the best-laid plans of the teacher, the scheduled substitute, and the school board. However, there is nothing to indicate that these would be more than isolated instances. The Board must have substitute teachers generally available to replace any teacher suddenly incapacitated by acute illness or by any number of other causes. Any conclusion that these substitutes could not handle additional, pregnancy-related emergencies is pure speculation on this record. We do not denigrate the Board's interest in providing "orderly transition between teachers," but the relationship between the maternity leave rule and that interest seems insufficiently "fair and substantial" to pass constitutional muster.

Turning to the additional administrative convenience suggested of avoiding many "battles of obstetricians," we put to one side the thought that the district court's analysis could as well justify a much harsher rule, requiring maternity leave to start at the end of three months of pregnancy, or two. More to the point, a disagreement between physicians may arise any time a teacher's medical problems might, in the eyes of the school administration, inhibit satisfactory performance of classroom obligations at some point in the future; yet the Board apparently chose to avoid medical "battles" only in the case of pregnancy. The obvious rejoinder is that pregnant teachers constitute by far the most numerous group among those who might require medical leave and that the Board could, therefore, legitimately deal with the problem on a class, rather than on an individual, basis. Apart from the speculation of the district court, however, there is nothing in the record to support this proposition; on the contrary, we are told that the maternity leave rule has been recently

amended precisely to provide for such individualized treatment. Even more significantly, Reed v. Reed, *supra*, indicates that the state interest in this sort of administrative convenience is not enough to justify an otherwise irrational statutory differentiation of the sexes. The Court there recognized that "the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy." 404 U.S. at 76, 92 S.Ct. at 254. Nevertheless, it held that "[t]o give a mandatory preference [as administrators of estates] to members of either sex over members of the other, *merely to accomplish the elimination of hearings on the merits . . . .*" (emphasis added), was forbidden by the equal protection clause. *Id.* While it might be easier for the Board to handle all maternity leave problems on an arbitrary, blanket basis, a reduced administrative workload is constitutionally insufficient to sustain this discriminatory treatment of pregnant women. See Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); cf. Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

■ From the foregoing analysis, we conclude that the Board's maternity leave rule, which arbitrarily forces a physically capable woman like plaintiff to leave her job before required to do so for medical reasons, is discriminatory and that there are no "legitimate state interests" which the rule's rigid classification sufficiently promotes to justify such discriminatory treatment. This conclusion would not prevent the Board from considering the question of leave for pregnant teachers on an individual basis as it apparently now does for nonpregnant teachers, female or male. We hold only that the particular Board rule before us denies plaintiff the equal protection of the laws.

Our conclusion is not altered by an examination of the decisions of other

mence midsemester. At oral argument, however, defendants claimed that Waterford had no formalized semester system.

We are without sufficient factual data to accept or reject defendants' assertion.

courts. Two closely divided courts of appeals, considering teacher maternity leave provisions substantially similar to the one before us, have reached diametrically opposite conclusions. Compare LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (6th Cir. 1972) (2–1 decision) (mandatory leave provision is unconstitutional), rev'g 326 F.Supp. 1208 (N.D.Ohio 1971), petition for cert. filed, 41 U.S.L.W. 3315 (U.S. Nov. 27, 1972) (No. 72–777), with Cohen v. Chesterfield County School Board, 474 F.2d 395 (4th Cir. 1973) (en banc; 4–3 decision) (contra), rev'g 326 F.Supp. 1159 (E.D.Va.1971). In addition, in Schattman v. Texas Employment Commission, 459 F.2d 32, 38–41 (5th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L. E.2d 688 (1973), the court held that a rule requiring pregnant employees to take a leave (without assurance of reinstatement) no later than "two months before the expected delivery date" did not deny equal protection.[18] Federal district courts in Illinois, Florida, New York, and California have reached the same result as we do with respect to comparable maternity leave rules. Bravo v. Board of Education, 345 F. Supp. 155 (N.D.Ill.1972); Pocklington v. Duval County School Board, 345 F. Supp. 163 (M.D.Fla.1972); Monell v. Department of Social Services, 4 CCH Empl. Prac. ¶ 7765 (S.D.N.Y. Apr. 12, 1972); Williams v. San Francisco Unified School District, 340 F.Supp. 438 (N.D.Cal.1972) (non-teacher employee).[19] In Struck v. Secretary of Defense, 460 F.2d 1372 (9th Cir. 1971), vacated and remanded for consideration of mootness, 409 U.S. 1071, 93 S.Ct. 676, 34 L.Ed.2d 660 (1972), the Ninth Circuit upheld against an equal protection claim an Air Force regulation providing for discharge of pregnant women officers;[20] contra, Robinson v. Rand, 340 F.Supp. 37 (D.Colo.1972). Obviously, the authorities are split, and for reasons already stated we prefer to align ourselves with those exemplified by the decision of the Sixth Circuit in *LaFleur*.

In sum, we conclude that plaintiff's complaint states a denial of equal protection of the laws and that summary judgment for defendants was erroneously granted. This, of course, does not end the case. Defendants have raised additional defenses not yet considered by the court below. In addition, the amount of damages, if any, to which plaintiff is entitled remains to be determined. We thus remand for further proceedings consistent with this opinion.

Reversed and remanded.

---

18. Judge Wisdom, dissenting from the majority's first holding, that plaintiff's employer was not covered by Title VII, 42 U.S.C. § 2000e(b)(1), would have found a violation of that Act and did not reach the constitutional question. 459 F. 2d at 41–43.

19. Plaintiff cites guidelines and cases promulgated and decided under fair employment statutes. These not only emphasize the limited impact of our holding, *LaFleur*, *supra*, 465 F.2d at 1186, but provide additional support. Thus, Guidelines recently promulgated by the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–15, provide that an employment policy which excludes applicants or employees from employment due to pregnancy is prima facie in violation of the statute. § 1604.10(a), 37 Fed. Reg. 6837 (Apr. 5, 1972). The Guidelines further provide that questions of maternity leave are to be treated as would leave for other temporary disabilities. Id. § 1604.10(b). Title VII has been recently amended to apply to public school employees. Pub.L. 92–261, § 2 (Mar. 24, 1972). State agencies have reached similiar results by way of adjudication. E. g., Staten v. East Hartford Bd. of Educ., 1 CCH Empl.Prac.Guide § 5055, at 3113–15 [loose-leaf service] (Conn. Comm'n on Human Rights and Opportunities, Mar. 28, 1972).

20. On a petition for rehearing, Judge Duniway dissented, though he had originally concurred in the majority opinion; he believed reversal was compelled by the Supreme Court's decision in Reed v. Reed, *supra*, handed down one week after the majority opinion. See 460 F.2d at 1378–1380. One Pennsylvania court has sustained a teacher maternity provision requiring termination of employment. Cerra v. East Stroudsburg Area School Dist., 3 Pa.Cmwlth. 665, 285 A.2d 206 (1971).